**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JAN 4 1999**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

ROBERT W. UNSER,

      Defendant-Appellant.

No. 97-1241

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. No. 97-CR-110-B)**

---

Todd S. Welch (Bobac A. Barjesteh and William Perry Pendley, with him on the brief) of Mountain States Legal Foundation, Denver, Colorado, for Defendant-Appellant.

Stacey Goh, Assistant U.S. Attorney (Henry L. Solano, United States Attorney, with her on the brief), Denver, Colorado, for Plaintiff-Appellee.

---

Before **PORFILIO, HOLLOWAY** and **TACHA,** Circuit Judges.

---

**HOLLOWAY,** Circuit Judge.

---

      Mr. Unser brings this timely, direct appeal from his conviction for unlawful possession and operation of a motor vehicle within a National Forest Wilderness Area in

violation of 16 U.S.C. § 551 and 36 C.F.R. § 261.16(a).  The maximum penalty for this conduct is a sentence of up to six months of imprisonment, a fine of up to $5,000, or both. 16 U.S.C. § 551 (setting out length of imprisonment authorized and maximum fine of $500); 18 U.S.C. § 3571(b)(6) (raising maximum fine to $5,000).  The crime charged is a Class B misdemeanor (because the maximum authorized punishment is more than thirty days but no more than six months, 18 U.S.C. § 3559(a)(7)) and a "petty offense," a category which includes misdemeanors of Classes B and C, plus "infractions," 18 U.S.C. § 19.[1]  After a two-day trial to the court, Unser was convicted and was sentenced to pay a fine of $75.

This case arises from a story of survival in the wilderness under extreme conditions and involves legal issues requiring examination of some of the most fundamental concepts in criminal law.  Like the parties obviously do, we view the case as having significance beyond the penalty actually imposed.

**I**

**A**

We will begin with an overview of the facts.  Our summary in this part of the opinion is based on the testimony of the defendant, who was the only witness at trial to have been present during the primary events.  Much of this evidence was undisputed; we will note later

---

[1]The significance of the petty offense category is that less stringent procedural rights are accorded to the accused who faces only charges of this type.  *See* Fed. R. Crim. P. 58. Thus, most significantly, the accused does not have a right to a jury trial.  Fed. R. Crim. P. 58(b)(2)(F).

in the opinion the critical areas which are in dispute.

On Friday, December 20, 1996, Mr. Unser set off to go snowmobiling with a friend, Robert Gayton. Unser, who lives in Albuquerque and has a ranch near Chama in far northern New Mexico, was very experienced with snowmobiles and fairly familiar with the place he chose for them to ride. Gayton had never been on a snowmobile before, and so took a few minutes to practice on the snowmobile at Unser's ranch. The two then loaded two snowmobiles onto a trailer and made a short drive on state highways across the state line into far southern Colorado, high in the San Juan Range of the Rocky Mountains near La Manga Pass.

They parked at the Red Lake Trail parking lot on state highway 17. From there, Unser planned a fairly short ride to the Jarosa Peak area of the Rio Grande National Forest. Unser planned on a fairly short ride for several reasons. It was already midday when they reached the parking lot to begin riding, and of course nightfall would come early at that time of the year. While Unser was a very experienced rider, he had only recently recovered from back surgery, and his companion, as we have noted, was a beginner.

Gayton rode around a few minutes in the immediate area of the parking lot to get more familiar with the machine and to riding in the deeper snow at the higher elevation near the pass. The two then set off for the Jarosa Peak area. The area around this peak includes a mesa, sometimes referred to as Jarosa Mesa, which was a climb of a few hundred feet from the parking lot. Unser said he chose this place because it was a fairly short and easy, yet

interesting, ride for the beginner, Gayton.

The weather was clear at first, but when the two men reached the mesa, Unser testified, a "ground blizzard" came up rather suddenly. A ground blizzard was described as the result of high winds blowing substantial amounts of fallen snow; these conditions may arise when no new snow is falling. Visibility was near zero. Unser's machine started having problems (the engine died repeatedly for the rest of the ill fated ride), and the situation became dangerous. The two men got lost trying to find their way back to the truck. Then, Gayton went off into a small ravine and his machine was stuck. They abandoned it and rode on. As they did, they were continually having to work on Unser's machine to get it restarted. Eventually, it failed completely. The men started walking but were still lost when night came. They dug a snow cave and spent the night in it. The next day they continued their wanderings on foot, suffering greatly. They hiked through the day and night until some time after midnight when they came upon a barn equipped with a telephone. They were soon rescued. They were treated at a local hospital for frostbite, dehydration and exhaustion.

**B**

We will now review other evidence presented at trial. While Mr. Unser and Mr. Gayton were lost in the rugged terrain of the National Forest battling the extreme cold and other adverse elements, friends and family were aware that they had not returned on Friday evening. On Saturday December 21 a search and rescue operation was organized. Some friends of Unser went up from Chama to the parking lot where his truck had been

noticed. On arriving there, they were told by a local deputy sheriff that they would have to wait for the authorized search and rescue team from Colorado to arrive, which they did. Eventually, six to eight people went out from the trail head on snowmobiles looking for Unser and Gayton. The rescuers did not actually get out on the mountain until mid-afternoon, and so had only a couple of hours before nightfall. In that time they found the snowmobile that Gayton had been riding, but were unable to find enough tracks to determine which way the two men had gone from there.

At trial four witnesses who had participated in the search and rescue operation testified. Only one of these witnesses, Richard Martin, was called by the government. Martin is a resident of southern Colorado and a veteran of a number of similar rescue efforts. Martin testified that the conditions were not bad on December 21 as the group began their search. The men were able to find tracks and, at least at first, to follow the path that Unser and Gayton had made the previous day. From the tracks, it appeared that Unser had started out from the parking lot on a fairly well defined trail, one which had in years past been used by cattlemen taking stock up to summer pastures. (We note at this point that all the witnesses at trial agreed that Unser's ill fated ride had begun along this route, but opinions were divided on where he might have gone after the first five or six miles.) That trail led up to what the witnesses referred to as Jarosa Mesa (but it is not clear from the record just how far this area goes). Conditions up on the mesa were very bad, as visibility was greatly reduced by blowing snow.

Martin testified that he found tracks on the mesa which appeared to have been made when Unser and Gayton were merely riding for fun; at the judge's suggestion, he marked "PT" on the enlarged map exhibit to show the area where he had found these "play tracks." The rescuers attempted to follow Unser's tracks from there, but tracking became very difficult because so many of the tracks had been erased by blowing snow by that time. Eventually, Martin found the snowmobile that Gayton had been riding. Martin testified that the tracks he had been following just before he found this first snowmobile indicated to him that the riders were lost and trying to find their way. The rescue team extricated the abandoned snow mobile and rode on, dividing into two groups. At nightfall, they suspended their efforts for the day.

Martin marked on the map for the court the point where he estimated that the first snow mobile had been found and made a line to show the route he believed he had taken to this point. The route as drawn by Martin proceeds for slightly over three miles in a northwesterly direction, almost in a straight line from the point where Martin had marked "play tracks" on the map, and ends about two miles past the boundary of the wilderness area. This testimony was later cited by the trial judge as the most credible and consistent evidence as to the location of the first machine, an issue of fact which was of considerable significance because of other findings by the judge, as we shall see.

It is worth noting that Martin's testimony was far from precise. Martin was candid in describing his effort as being less than certain, twice describing it as a guess. When the

rescuers split into groups after having found the first abandoned snowmobile, Martin had ridden to Red Lake, which was northeast of the point he marked on the map as the likely location of the first machine. Martin testified that his estimate of the location of the snowmobile was based in part on his belief that he had been going northeast from that point to Red Lake during the rescue efforts.

Martin had gone back to the area only a few days before trial in the company of Forest Service Agent Burd, among others, to see if he could retrace the path he had taken during the rescue effort. Martin testified that they were very careful to stay out of the Wilderness Area and stopped before reaching the place where Martin believed the first snow mobile had been found. (Although it was June when this effort was made, they were on snowmobiles.) As the defense has emphasized, both at trial and on appeal, Martin said that the odometer on his snowmobile read 7.2 miles when he turned back at a point he (or others with him) estimated to have been about a quarter of a mile short of the wilderness boundary.[2] Martin also testified that during this second visit to the area he tested his sense of direction and found that he was off by eighty degrees. He was not asked to explain whether he had accounted for this when he testified that he believed that the first snowmobile had been found southwest of Red Lake.

---

[2]It is interesting to note that on this second visit to the area, Mr. Martin had the advantage of much better weather conditions and the assistance of maps and guidance from the Forest Service. Even so, he was uncertain just where the wilderness boundary was and said that he had never seen signs in this area marking the boundary.

## C

About three weeks after this adventure, Unser contacted officials with the Forest Service's office in Albuquerque for assistance in finding the second snowmobile. Unser met with Ben Tafoya, a Forest Service Agent, on January 7, 1997, in Albuquerque. Because he had been told that he might need a permit to retrieve the machine, Unser brought with him a friend, Gabe Valdez, and Manny Martinez. Before retiring, Manny Martinez had been a supervisor in the law enforcement unit of the Forest Service and indeed had formerly been Tafoya's immediate supervisor. These men met and went over maps trying to determine where the machine might have been abandoned, but they believed that they had accomplished little. Further efforts were planned for the next day.

Tafoya told Unser that he would contact officials with the Colorado offices of the Forest Service who would be more familiar with the area and of more assistance. When Tafoya first contacted officials in Colorado, he asked to speak to Chris Ortiz, the law enforcement officer for that area. Ortiz told Tafoya that he should speak with Brenda Schultz or Charlie Burd, who were investigating the incident for possible violation of the ban on use of motor vehicles in a wilderness area, having determined that Unser probably had entered the South San Juan Wilderness Area of the Rio Grande National Forest. Those two agents, Burd and Schultz, arranged to come to meet with Unser at Tafoya's office the following day. Tafoya was asked not to tell Unser that these officers wanted to talk to him as part of their criminal investigation. Instead, Tafoya merely told Unser that two agents were coming down

from Colorado who could help him locate and retrieve his snowmobile.

Charlie Burd, special agent with the Forest Service, testified that he, along with Brenda Schultz, met with Unser the next day for about three and a half hours in a conference room near Tafoya's office in Albuquerque. Unser came by himself to this meeting. Burd indicated that Unser was mostly cooperative during this meeting, but Burd suggested that Unser was less than candid at times in saying that he had no idea which way he had gone after leaving Jarosa Mesa. After lengthy and not very productive discussions, Burd asked Unser to draw a sketch of the valley where the second machine had been abandoned. From this sketch, Burd testified he was able to recognize the area. Burd then showed Unser an aerial phoptograph, using a stereoscopic device to give the photo a three dimensional effect. Unser immediately recognized the photograph Burd had selected. Six months later, just the week before trial, Burd located the second machine, still stuck in the snow, very near the place that he and Unser had identified in the January meeting. Burd marked that point on the topographical map that Martinez had used in his testimony, government's exhibit 3. The point is almost due east of the point identified by Martinez as the most likely location of the recovery of the first machine.

Burd testified that Unser never indicated to him that he had any concern for his safety until the second snowmobile failed. Unser had said that he had been in this area about ten times before, but that he was unsure just where they had gone because he simply had not been paying attention while he was enjoying the sport. According to Burd's testimony, Unser

told him that after the first machine got stuck, with the weather beginning to be bad, Unser decided to try to head straight back to the parking lot, rather than to return by retracing their path. Unser had told Tafoya that at that point he started following the "windrows." Windrows are wave like patterns in the snow which, Tafoya testified, would generally run east to west in this area.

**D**

As for the defense evidence, for purposes of our review we need not go into any detail. The trial judge clearly did not find much of the defendant's evidence on critical issues to be credible. It is sufficient to note that two members of the rescue team attempted to locate on the map the point where they thought the first snowmobile had been recovered, and like defendant in his testimony, both fixed this point as being outside the wilderness area, before Unser and Gayton would have reached the wilderness boundary. Matthew Martinez testified that he was among those who went back to the area on Sunday, December 22, after Unser and Gayton had been rescued, to retrieve the first snowmobile. He said that the snowmobile's odometer showed eight miles plus some tenths. Several witnesses agreed that a snowmobile's odometer usually shows more miles than has actually been traveled. This is because the odometer registers revolutions of the track, which often slips especially when the rider is attempting to climb a steep slope. Mr. Burd testified that the route apparently taken by Unser up to the top of Jarosa Mesa was so steep that when he made the climb himself he thought at first that his machine would not be able to do it.

- 10 -

## II

On appeal from a criminal conviction, of course, we view the evidence in the light most favorable to the prosecution. In the instant case, where the trial judge found the facts specially, even though not requested to do so,[3] the findings may not be disturbed unless clearly erroneous. *Campbell v. United States*, 373 U.S. 487, 493 (1963).

We will summarize the district judge's findings as a prelude to our analysis of the legal issues raised by Mr. Unser. Although there is essentially no dispute as to the main events as described by Unser and as we have just summarized, there certainly was dispute about important details. The trial judge did not credit Unser's testimony in its entirety. In particular, the judge found that the two riders left the Jarosa Peak area before any emergency arose and that they were intentionally riding northwest, further away from where they had begun their ride, because they were still just riding for fun.

The judge found that Mr. Martin's testimony as to the location of the first snowmobile was the most credible, and he gave several reasons for this finding. The fact that the second machine was eventually recovered almost due east from where Mr. Martin fixed the location of the first machine was consistent with the Unser's statements, both in the interview with Burd and in his trial testimony, that after abandoning the first machine he and Gayton

---

[3]In the trial of a criminal case without a jury, the judge must make a general finding and "shall in addition, on request before the general finding, find the facts specially." Fed. R. Crim. P. 23(c). The findings may be oral or may be stated in an opinion or memorandum of decision.

- 11 -

attempted to follow the windrows, which the evidence established ran west to east. The judge found that the odometer reading on the first machine, when it was recovered, was a little over eight miles. The judge then said that he had used a piece of wire to determine the distance to the spot on the map marked by Mr. Martin, following the route Martin had said that rescuers had used in following the tracks left by Unser and Gayton. From this examination of the evidence, the judge determined that it was about 4.2 miles from the parking lot to the place which Martin had estimated to be the location of the abandoned first snowmobile. (In fact, the judge misread the scale of the map; the distance is twice what he found it to be. This is clear because he made findings about other points on the map, each of which is plainly based on the same erroneous reading of the scale of miles.)

The judge then proceeded to consider Unser's contention that if he had entered the wilderness area with a snowmobile, he had done so only under a life-threatening emergency. The judge had held before trial that Unser would have the burden of proving this defense by a preponderance of the evidence. This conclusion was based on another holding made before trial, *i.e.*, that the offense charged was a strict liability offense and accordingly the government would not have to prove any intent to snowmobile in the wilderness area, nor would the government have to prove that Unser knew that he had entered a wilderness area. The judge stated, "[T]he law ought to afford, and I believe does, a measure of defense to the citation issued here based upon emergency and defenses otherwise known essentially as a necessity defense, sometimes called a choice of evils defense." II App. at 687.

- 12 -

Accordingly, in the judge's view it was critical to determine whether emergency conditions had arisen before or after Unser had entered the wilderness area. The judge specifically found that an emergency did not arise until "either just before or just after Mr. Gayton's machine got stuck." II App. at 689. Based on his finding that the more credible evidence was that the first machine had been found inside the wilderness boundary, the judge concluded and held that the defense had failed to carry the burden of establishing the necessity defense, and pronounced the defendant guilty.

This appeal followed. The major contentions of defendant Unser on appeal are: (1) the district judge erred by holding that the offense of violation of 16 U.S.C. § 551 and 36 C.F.R. § 261.16(a) of possessing and using a motor vehicle in a Wilderness Area contains no *mens rea* requirement; (2) the judge erred by denying defendant Unser the necessity defense in the emergency conditions that confronted Unser and his companion; and (3) the judge erred in denying defendant Unser's motion to suppress his statement based on the involuntariness of the statement and violation of his rights under the *Miranda* doctrine.

We will analyze these issues in turn.

### III

First, we address the *mens rea* issue:

"Few areas of criminal law pose more difficulty than the proper definition of the *mens rea* required for any particular crime." *United States v. Bailey*, 444 U.S. 394, 403 (1980). Our task is to determine, as best we can, the intent of Congress in empowering the

Secretary of Agriculture to adopt regulations applicable to National Forest lands and enforceable by criminal penalties. Then, having found that intent, we must determine whether the intent is compatible with due process. Unfortunately, we find little direct guidance in the language Congress used.[4] The regulation promulgated by the Secretary of Agriculture likewise reveals little on this question.[5] However, while the statute and regulation involved here do not contain a *mens rea* element, "silence on this point by itself does not necessarily suggest that the [legislators] intended to dispense with a conventional

---

[4]16 U.S.C. § 551 provides, in pertinent part:

> The Secretary of Agriculture shall make provisions for the protection against destruction by fire and depredations upon the public forests and national forests which may have been set aside or which may be hereafter set aside . . . and he may make such rules and regulations and establish such service as will insure the objects of such reservations, namely, to regulate their occupancy and use and to preserve the forests thereon from destruction; and any violation of the provisions of this section . . . or such rules and regulations shall be punished by a fine of not more than $500 or imprisonment for not more than six months, or both.

As noted earlier, Congress changed the maximum fine from $500 to $5,000 in 1987. *See* 18 U.S.C. § 3571(b)(6). Thus, at the time of this offense in 1996, the maximum penalties to which Mr. Unser could have been sentenced were a fine of not more than $5,000, or imprisonment for not more than six months, or both.

[5]The regulation under which Mr. Unser was prosecuted provides:

> The following are prohibited in a National Forest Wilderness:
>
> (a) Possessing or using a motor vehicle, motorboat or motorized equipment except as authorized by Federal Law or regulation.

36 C.F.R. § 261.16

- 14 -

*mens rea* element." *Staples v. United States*, 511 U.S. 600, 605 (1994); *Morissette v. United States*, 342 U.S. 246, 263 (1952); *United States v. Martinez-Morel*, 118 F.3d 710, 716 (10th Cir. 1997).

*Morissette* also noted, however, that the general presumption that some guilty purpose is required is not applicable to what have been termed public welfare offenses, which typically impose penalties to serve as an effective means of regulation. The Court's observations about the nature of such public welfare offenses provide a helpful starting point for our analysis:

> These cases do not fit neatly into any of such accepted classifications of common-law offenses, such as those against the state, the person, property, or public morals. Many of these offenses are not in the nature of positive aggressions or invasions, with which the common law so often dealt, but are in the nature of neglect where the law requires care, or inaction where it imposes a duty. Many violations of such regulations result in no direct or immediate injury to person or property but merely create the danger or probability of it which the law seeks to minimize. While such offenses do not threaten the security of the state in the manner of treason, they may be regarded as offenses against its authority, for their occurrence impairs the efficiency of controls deemed essential to the social order as presently constituted. In this respect, whatever the intent of the violator, the injury is the same, and the consequences are injurious or not according to fortuity. Hence, legislation applicable to such offenses, as a matter of policy, does not specify intent as a necessary element. The accused, if he does not will the violation, usually is in a position to prevent it with no more care than society might reasonably expect and no more exertion than it might reasonably exact from one who assumed his responsibilities. Also, penalties commonly are relatively small, and conviction does no grave damage to an offender's reputation. Under such considerations, courts have turned to construing statutes and regulations which make no mention of intent as dispensing with it and holding that the guilty act alone makes out the crime.

*Morissette*, 342 U.S. at 255-56 (emphasis added).

- 15 -

Following *Morissette*, the Eighth Circuit has stated that

> where a federal criminal statute omits mention of intent and where it seems to involve what is basically a matter of policy, where the standard imposed is, under the circumstances, reasonable and adherence thereto properly expected of a person, where the penalty is relatively small, where the conviction does not gravely besmirch [the reputation], where the statutory crime is not one taken over from the common law, and where congressional purpose is supporting, the statute can be construed as one not requiring criminal intent. The elimination of this element is then not violative of the due process clause.

*Holdridge v. United States*, 282 F.2d 302, 310 (8th Cir. 1960)(Blackmun, J.); *see also Tart v. Massachusetts*, 949 F.2d 490, 502 (1st Cir. 1991). Additionally, the Supreme Court has indicated that most public welfare offenses involve situations where a reasonable person should know that the conduct is subject to stringent regulation and may seriously threaten a community's health or safety. *Liparota v. United States*, 471 U.S. 419, 433 (1985).

The government contends, and we agree, that the regulation at issue here satisfies most of these criteria, conceding however that the conduct in question does not seem to seriously threaten a community's health or safety. The government states: "Admittedly, it is difficult [to] characterize the use of motorized vehicles in a wilderness area as conduct 'that may seriously threaten a community's health or safety.'" Brief of Appellee at 14 (quoting *Liparota v. United States*, 471 U.S. 419, 433 (1985)). Nevertheless, we are persuaded that 16 U.S.C. § 551 and 36 C.F.R. § 261.16(a), the applicable statute and regulation involved here, do create a "public welfare offense." Indeed, several other courts have found that such Forest Service regulations define public welfare offenses. *E.g., United States v. Kent*, 945 F.2d 1441, 1446 (9th Cir. 1991)(unauthorized occupancy of National

- 16 -

Forest land); *United States v. Larson*, 746 F.2d 455, 456 (8th Cir. 1984) (trespass by cattle); *United States v. Wilson*, 438 F.2d 525 (9th Cir. 1971) (cutting wood); *United States v. Northwest Pine Products*, 914 F. Supp. 404 (D. Ore. 1996) (timber operations); *but see United States v. Semenza*, 835 F.2d 223 (9th Cir. 1987)(mental element held implied in offense of allowing unauthorized livestock entry in National Forest); *United States v. Launder*, 743 F.2d 686 (9th Cir. 1984)(proof required of some intent or fault in permitting fire out of control in National Forest) *United States v. Osguthorpe*, 13 F. Supp.2d 1215 (D. Utah 1998) (mental element required for offense of allowing unauthorized livestock to enter National Forest).

We must decide the effect of the omission from the statute and regulation of a *mens rea* requirement. Under the proposition distilled by Justice Blackmun's *Holdridge* opinion for the Eighth Circuit from earlier cases, 242 F.2d at 310, we are persuaded that most of the conditions are met for treating the offense charged here as a public welfare offense lacking a *mens rea* requirement: there is, as noted, no mention of an intent in the statute or regulation; the duty imposed is reasonable, under the circumstances, and adherence properly expected; the statutory scheme is not one taken from the common law and congressional purpose is supportive; and conviction does not gravely besmirch one's reputation, involving only a misdemeanor. The troublesome question remaining is whether "the penalty is relatively small." *Holdridge*, 282 F.2d at 310.

Taking into account the 1987 increase in the potential fine, the maximum penalties

are a $5,000 fine, or imprisonment for not more than six months, or both. These are not *de minimis*, in our judgment, but the test is whether "the penalty is <u>relatively small</u>," as *Holdridge*, 282 F.2d at 310 (emphasis added), states. This follows the test laid down by the Supreme Court in *Morissette*, that "penalties commonly are <u>relatively small</u>," 342 U.S. at 256 (emphasis added), for public welfare offenses where no mention of intent is made and the guilty act alone makes out the crime. In *Staples*, the Court noted that cases that first defined the concept of public welfare offenses involved statutes that "punished only <u>light penalties such as fines or short jail sentences</u> . . . ." 511 U.S. at 616.[6] Later *Staples* referred to "<u>small penalties</u>" being attached to such public welfare offenses as logically complementing the absence of a *mens rea* requirement. *Id*. (emphasis added). We have addressed a similar issue in *United States v. Corrow*, 119 F.3d 796, 805 (10th Cir. 1997), *cert. denied*, 118 S. Ct. 1089 (1998), in the context of Migratory Bird Treaty Act misdemeanor violations carrying a potential fine up to $5,000 or imprisonment of not more than six months, or both. *See* 16 U.S.C. § 707(a) and 18 U.S.C. § 3571(b) (raising maximum fine up to $5,000 in 1987). In *Corrow*, we joined other circuits in holding such offenses are strict liability without a scienter requirement.

This 1996 offense occurred in a time frame when heavier sentences of imprisonment

---

[6]In *Staples*, the Court cited *Commonwealth v. Raymond*, 97 Mass. 567 (1867)(fine up to $200 or six months in jail, or both); *Commonwealth v. Farrer*, 91 Mass. 489 (1864)(fine); and *People v. Snowburger*, 71 N.W. 497 (Mich. 1897)(fine up to $500 or incarceration in county jail).

and fines are more common. In light of these circumstances and the lack of besmirching an offender's reputation by a felony conviction, we are persuaded that the public welfare offense in question here was properly held by the district judge not to have a required *mens rea* element.

## IV

As we have earlier noted, the district judge held that Unser could assert a common law defense of necessity, based on the life threatening situation he faced when he became lost in the extreme conditions that have been described. The judge eventually ruled, however, that Unser had not carried the burden of proving the necessity defense by a preponderance of the evidence. Unser argues on appeal that the district judge erred in holding that he had the burden of proof on the necessity defense,[7] and also argues that the evidence showed that any entry into the wilderness area should have been excused under the necessity defense.

We have discussed the necessity defense on several occasions. It is well settled, and not challenged here, that the defendant at least must bear the initial burden of producing evidence which could support a finding in his favor on each element of the defense. The government does not dispute that defendant met this burden of production and that the trial judge properly considered the necessity defense in this case. Various formulations of the

_____

[7]In written submissions to the district court, the defendant twice stated that the burden of proof was on him. Nevertheless, because the district court evidently did not hold defendant to this position, but instead permitted defendant later to argue that the burden should be on the government, and because the government does not urge on appeal that this issue has been waived, we conclude that the issue has been preserved.

elements of the defense may be found, but for our purposes we need only examine one such formulation. The necessity defense may excuse an otherwise unlawful act if the defendant shows that "(1) there is no legal alternative to violating the law, (2) the harm to be prevented is imminent, and (3) a direct, causal relationship is reasonably anticipated to exist between defendant's action and the avoidance of harm." *United States v. Meraz-Valeta*, 26 F.3d 992, 995 (10th Cir. 1994) (citing *United States v. Seward*, 687 F.2d 1270, 1276 (10th Cir. 1982) (en banc)).

The district court's holding that the burden of proof on the defense of necessity was on the defendant was expressly based on the prior ruling that the offense charged did not include a *mens rea* element. I App. at 119-20 (citing *United States v. Toney*, 27 F.3d 1245 (7th Cir. 1994)); II App. at 687. The trial judge recognized the fundamental principle that the government must bear the burden of proof beyond a reasonable doubt of each element of a criminal offense. *In re Winship*, 397 U.S. 358 (1970). It follows from this that when evidence has been produced of a defense which, if accepted by the trier of fact, would negate an element of the offense, the government must bear the ultimate burden of persuasion on that element, including disproving the defense. *Mullaney v. Wilbur*, 421 U.S. 684 (1975).[8]

---

[8]The Court in *Mullaney* unanimously held that it was a violation of the constitutional guarantees of due process for Maine to require a murder defendant to shoulder the burden of persuasion of establishing that he acted in the heat of passion on sudden provocation, so as to qualify for conviction of the lesser offense of manslaughter. Two terms later, the Court considered a New York statute which similarly placed on the defendant in homicide cases the burden of persuasion as to the statutory defense of "extreme emotional disturbance." *Patterson v. New York*, 432 U.S. 197 (1977). The Court upheld that statute because the

*See generally* 1 Wayne R. LaFave & Austin W. Scott, Jr., Substantive Criminal Law § 1.8(c) (1986).  In the instant case, however, we do not face a constitutional issue involving defendant's due process rights.  The Constitution *permits* allocation of the burden of proof to the defendant with respect to a defense which does not negate an element of the crime.  *E.g., Patterson v. New York*, 432 U.S. 197 (1977).  Therefore, because we have affirmed the district court's ruling that the offense charged may be proven without proof that defendant intended to take his motor vehicle into the protected area, or even knew that he had done so, the trial judge's ruling on the burden of proof on the necessity defense did not deny defendant any basic right.  There still remains the question, however, whether the burden of proof was properly placed on defendant or whether some authority other than the Constitution would require the opposite conclusion.  Unfortunately, neither the statutes, the regulations, nor the cases provide much guidance on when the burden of proof should be allocated to the defendant for such a defense.  We must resolve the issue with the minimal guidance that these sources provide.

One factor which is relied on is a practical one.  Often it is the defendant who is most likely to have access to the facts needed to prove such a defense, and this case seems to be of that type.  This pragmatic element is one which may properly be taken into account, as the

---

crime was defined broadly as requiring only two elements – intent to cause the death of another and causing the death of that person or a third person.  Because there was no requirement analogous to the common law element of malice aforethought, the defense did not involve negating such an element, or any element, of the crime.

Supreme Court has recognized for at least most of this century. *See Morrison v. California*, 291 U.S. 82, 91 (1934). In *Morrison*, the Court stated that the burden of establishing an affirmative defense may properly be placed on the defendant if there exists "a manifest disparity in convenience of proof and opportunity for knowledge, as, for instance, where a general prohibition is applicable to every one who is unable to bring himself within the range of an exception." *Id.*

We think it is manifest that the regulation at issue here is "a general prohibition." It would be impractical, we believe, to impose on the government the burden of disproving necessity beyond a reasonable doubt, and this case demonstrates why this is so. It would be impractical to expect that the boundaries of wilderness areas could be policed in such a way that the government would have access to evidence to disprove a necessity defense. We think, in fact, that requiring the government to disprove the necessity defense could impede enforcement of the regulatory scheme.

Therefore, we hold that the district judge did not err in ruling that Unser had the burden of proving the defense of necessity.

We note briefly that Unser raises a sufficiency of the evidence issue as part of his attack on the trial court's rulings on the necessity defense. This argument is at least partially premised on the contention, which we have rejected, that the burden of proof should have been on the government to establish beyond a reasonable doubt that Unser had already committed the violation by entering the wilderness area on his snowmobile before the

emergency arose. That argument of course must fail as a consequence of our rejection of its premise.

Unser does also argue that the evidence was insufficient regardless of the burden of proof on the necessity defense. We have carefully reviewed the record and we disagree. Unser's argument on this point overlooks, among other things, Agent Burd's testimony that Unser's statements only three weeks after the ordeal were inconsistent with his trial testimony and that Unser had said then that he did not know where he had gone only because he hadn't been paying much attention, not because he was lost in a ground blizzard. Unser's argument on appeal also overlooks the evidence of the location of the second machine, and Unser's testimony that he had been following the windrows before the second machine failed. We have already noted that the trial judge specifically relied on these facts as strong evidence of the location of the first snowmobile. The evidence as to the location of the second machine was much more certain, and the windrow evidence links that more definite point to the location of the first machine.

Much of Unser's argument is devoted to recounting the inconsistencies in the other evidence about the location of the first machine, with particular emphasis on the district judge's mistake in reading the scale of miles on the enlarged map, exhibit 3, to which we have previously referred.[9] This part of the evidence is somewhat troublesome. Applying the

---

[9]We remind the readers that the district judge's finding that the emergency arose about the time that the first machine had to be abandoned is what makes the spot where that machine was recovered of such great importance here.

- 23 -

correct scale of miles, it appears that it is approximately 6.7 miles from the Red Lake Trail parking lot, where the ride began, to the boundary of the wilderness. As we have noted, Mr. Martin, on whom the trial judge relied heavily, estimated the distance at 7.2 miles, based on his having tried to retrace the route.

As Unser points out, the evidence was that Gayton had driven the machine twice just for practice, once at Unser's ranch and once in the area of the parking lot. Further, the evidence that the odometers overstate actual mileage because of slippage of the propulsion mechanism, evidence that Unser and Gayton had been making "play tracks" and then had been wandering apparently lost, and the fact that the rugged terrain would make it unlikely that the actual route taken would be as direct as a line drawn on a map, all are factors which, Unser urges, make it highly unlikely, if not impossible, that Gayton's machine reached the wilderness boundary, given that its odometer showed mileage of less than nine miles.

Although it may be that a rational fact finder could have accepted these contentions, we do not find the evidence so one-sided that we could hold the trial judge's adverse findings to be clearly erroneous. We believe that the district judge did not err in weighing all the evidence and finding that Unser had not proven by a preponderance of the evidence that the emergency arose before he entered the wilderness area.

## V

Finally, we consider Unser's contentions relating to the statements he made in the meeting with Agents Burd and Schultz in Albuquerque. Unser makes two contentions. First,

he says that his statements should have been suppressed because he was subjected to custodial interrogation without having been advised of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). Second, Unser contends that the statements should have been suppressed because they were involuntary, being the product of deception practiced on him by the agents. The district court rejected both contentions. The judge made a specific finding of fact that Unser was not in custody during the meeting, from which it followed that the agents were not required to advise him of his rights under *Miranda*. The judge also found that Unser was not coerced into making statements and concluded that the statements were voluntary.

The *Miranda* issue merits little discussion. The district court's finding that Unser was not in custody is reviewed only for clear error. *United States v. Glover*, 104 F.3d 1570, 1578 (10th Cir. 1997). The evidence supporting the district judge's finding that Unser was not in custody was essentially undisputed and was easily sufficient. The evidence was that Unser voluntarily appeared both on January 7 and January 8. During both days Unser frequently took telephone calls on his cellular phone and obviously felt free to leave the room whenever he wanted because he did so, going out into the hallway to talk on the telephone several times. There was no evidence of any coercive tactics, nor of anything coercive about the atmosphere of the meeting which would have led Unser to believe that he was not free to leave at any time. We affirm the district court's conclusion that there was no violation of the requirements of *Miranda*.

As to the issue of voluntariness, as noted in part I-C, supra, Unser was told only that the agents would help him retrieve his snowmobile, even though the agents' purpose was to further their criminal investigation. The trial court found that "a measure of subterfuge" had been employed by the agents when they induced Unser to return to the offices in Albuquerque for the purpose of meeting with Agents Burd and Schultz, without telling Unser that he was the target of a criminal investigation and instead leading him to believe that they were simply trying to assist him in finding his abandoned snowmobile. On the other hand, the judge also found that the evidence would support a reasonable inference (which he apparently drew) that Unser knew that he might be cited for entering a wilderness area. The judge referred to Unser having brought retired Agent Martinez and retired state trooper Valdez to the first meeting with Agent Tafoya. Also, the judge referred to testimony by Tafoya that at one point during his meeting with the three men, at a time when Unser himself might have left the room temporarily, Tafoya asked if Unser had been cited. The court found as a matter of fact that Unser's statements were not coerced.

We review the district court's subsidiary findings of fact only for clear error, but the issue of voluntariness of the statements is ultimately a question of law which we review *de novo*. *Glover*, 104 F.3d at 1579-80. On the legal issue of whether the statements were voluntary, we consider the age, intelligence, and education of the defendant; the length of the detention (if any); the length and nature of the questioning; whether the defendant was advised of his constitutional rights; and whether physical coercion was employed. *Glover*,

104 F.3d at 1579. The inquiry is to include all the facts and circumstances *Id.* The ultimate question in this case is whether the promise of helping Unser to locate his snowmobile resulted in his will being overborne. *Id.*

We find no clear error in the trial court's subsidiary findings. These included findings that Unser was a man of intelligence and experience. As previously alluded to, the court found that the fact that Unser initially enlisted two men with law enforcement backgrounds to accompany him to meet with Tafoya suggested that Unser had some idea that he might be under investigation for entering the wilderness area with his snowmobile. The judge also found, as we read his comments, that Unser was a strong willed individual as evidenced by his having survived this ordeal and by other circumstances, including the fact that Unser had achieved great fame and success as a race car driver in his earlier years.

Considering all the surrounding circumstances, we affirm the district judge's holding that the statements were voluntarily made and therefore admissible at trial.

**VI**

For the reasons given, the judgment is **AFFIRMED.**