**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Kirk A. ELLISON, Defendant–Appellant.**

**No. CRIM.A.99–CR–341.**

United States District Court,
D. Colorado.

Sept. 19, 2000.

Robert T. Kennedy, Assistant U.S. Attorney, Durango, CO, for Plaintiff.

Castelar M. Garcia, Alamosa, CO, for Defendant.

## MEMORANDUM OPINION AND ORDER

BABCOCK, Chief Judge.

Defendant Kirk Ellison was charged under 16 U.S.C. § 551, 18 U.S.C. § 2, and 36 C.F.R. § 261.10(1) with three counts of violating the terms and conditions of a Department of Agriculture special use permit. Mr. Ellison consented to a trial before Magistrate Judge Watanabe, and was convicted of all three counts. Mr. Ellison appeals that conviction. Jurisdiction is proper pursuant to 18 U.S.C. § 3402. I affirm.

### I. Facts

The Magistrate Judge found, and the parties do not dispute, the following. Mr. Ellison and his company, Lazy Double FF Outfitting, were issued a temporary special use permit by the United States Department of Agriculture. Mr. Ellison was the holder of the permit. The permit is not assignable or transferable, and states, "The holder, in exercising the uses authorized by this permit, will assume responsibility for compliance with the regulations of the Department of Agriculture and all Federal, State, county, and municipal laws, ordinances, or regulations which are applicable to the area or operations covered by this permit." The permit was signed by Mr. Ellison. The permit required that Mr. Ellison keep and file an approved itinerary for all outfitting trips, as well as an annual operating plan and a trip log. Mr. Ellison was also required to provide the Department with a list of Lazy Double FF Outfitting's employees and vehicles. Mr. Ellison did so, listing among others an employee named Lucas McLarty and a 1994 GMC Pickup.

The permit did not include an area known as Trout Creek in the Rio Grande National Forest in Colorado. However, on July 16–17, 1997 Lucas McLarty took four people by horseback to Trout Creek for a fishing trip. The trip was booked on July 15, 1997 by Mr. Ellison's father, and used Lazy Double FF Outfitting's GMC truck, horses, and tack. At the conclusion of the fishing trip, the customer gave a check for $397.50 to Mr. McLarty. The memo on the check read "trout creek (5) horses." The check was endorsed by Mr. Ellison and deposited into Lazy Double FF Outfitting's bank account. At no time did the customers receive a written contract as required by Colorado law. *See* Colo.Rev. Stat. § 12–55.5–109(1). At no time was the check returned or a refund offered to the customers. Although Mr. Ellison filed trip itinerary documents for other trips, none were filed for Trout Creek. Additionally, no log sheets exist for the trip.

Mr. Ellison maintained at trial that he had no knowledge of the Trout Creek trip. He testified that he was in Oklahoma purchasing a horse at the time, and he neither booked nor approved the trip. Although he endorsed the check, Mr. Ellison testified that he did not know what it was for. The Magistrate Judge did not find this testimony credible. Mr. Ellison's father and sister (the company's book keeper) testified that they were unaware that the special use permit excluded Trout Creek.

Mr. Ellison was charged with three counts of violating the terms and conditions of his special use permit: operating in an unauthorized location, keeping an inaccurate trip log, and failing to provide a written contract. The Magistrate Judge concluded that Mr. Ellison's employees

were acting within the scope of their employment and with an intent to benefit Mr. Ellison and his company in planning and executing the Trout Creek trip, and Mr. Ellison ratified their actions by endorsing and depositing the check. He also concluded that the three charged counts were strict liability offenses, requiring no *mens rea*. He found that Mr. Ellison violated terms and conditions of the special use permit by keeping an inaccurate trip log and by failing to provide the Trout Creek customers with a written contract. Mr. Ellison was sentenced to pay a fine of $397.50 ($132.50 for each count) and an assessment of $30.00. The Department of Agriculture subsequently declined to reissue Mr. Ellison a permit.

## II. Appeal

■ Post-conviction review of a magistrate judge's judgment is governed by same standards as appeal from judgment of a federal district court to the court of appeals. *See United States v. Ramirez*, 555 F.Supp. 736 (E.D.Cal.1983); *United States v. Welsh*, 384 F.Supp. 531 (D.C.Kan. 1974). I review the Magistrate Judge's conclusions of law *de novo*, applying the same standard used by the Magistrate Judge in making his initial ruling. *See Naimie v. Cytozyme Labs., Inc.*, 174 F.3d 1104, 1108 (10th Cir.1999); *Olguin v. Lucero*, 87 F.3d 401, 403 (10th Cir.), *cert. denied*, 519 U.S. 982, 117 S.Ct. 436, 136 L.Ed.2d 334 (1996). I review the Magistrate Judge's fact findings for clear error. *See Naimie*, 174 F.3d at 1108. "A finding of fact is 'clearly erroneous' if it is without factual support in the record or if the appellate court, after reviewing all the evidence, is left with a definite and firm conviction that a mistake has been made." *Manning v. United States*, 146 F.3d 808, 812 (10th Cir.1998) (citation and quotation omitted).

Mr. Ellison first argues that the Magistrate Judge erroneously relied on a complicitor theory. I find no indication in the Magistrate Judge's Memorandum Opinion and Order that Mr. Ellison was convicted as a complicitor, aider, or abettor. I therefore conclude that the Magistrate Judge did not err in this regard.

■ Mr. Ellison next argues that the Magistrate Judge erred in holding that the three charged offenses were strict liability offenses. I disagree.

Congress has authorized the Secretary of Agriculture to "make such rules and regulations and establish such service as will insure the objects of [public and national forest] reservations, namely, to regulate their occupancy and use and to preserve the forests thereon from destruction; and any violation of ... such rules and regulations shall be punished by a fine of not more than $500 or imprisonment for not more than six months, or both. Any person charged with the violation of such rules and regulations may be tried and sentenced by any United States magistrate specially designated for that purpose by the court by which he was appointed ...." 16 U.S.C. § 551. Pursuant to this authority, the Secretary of Agriculture has prohibited "[v]iolating any term or condition of a special-use authorization, contract or approved operating plan." 36 C.F.R. § 261.10(1).

■ All three counts alleged violations of the special use permit in violation of 16 U.S.C. § 551 and 36 C.F.R. § 261.10(1). The language of those sections does not, however, indicate the applicable *mens rea*. When assigning a *mens rea* as an element of a crime, courts must follow congressional intent. *See United States v. Bailey*, 444 U.S. 394, 406, 100 S.Ct. 624, 62 L.Ed.2d 575 (1980). The language of the statute is the starting place of an inquiry. *See Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253–54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992). "Nevertheless, silence on this point by itself does not necessarily suggest that Congress intended to dispense with a conventional *mens rea* element, which would require that the defendant know the facts that make his conduct ille-

gal." *Staples v. United States,* 511 U.S. 600, 604–606, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994); *see also United States v. Balint,* 258 U.S. 250, 251, 42 S.Ct. 301, 66 L.Ed. 604 (1922) (traditionally, "scienter" was a necessary element in every crime). "The existence of a *mens rea* is the rule of, rather than the exception to, the principles of Anglo–American criminal jurisprudence." *United States v. United States Gypsum Co.,* 438 U.S. 422, 436, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978) (internal quotation marks omitted). Offenses that require no *mens rea* are generally disfavored. *See Liparota v. United States,* 471 U.S. 419, 426, 105 S.Ct. 2084, 85 L.Ed.2d 434 (1985); *accord Morissette v. United States,* 342 U.S. 246, 250, 72 S.Ct. 240, 96 L.Ed. 288 (1952). Some indication of congressional intent, express or implied, is required to dispense with *mens rea* as an element of a crime. *Cf. United States Gypsum,* 438 U.S. at 438, 98 S.Ct. 2864; *Morissette,* 342 U.S. at 263, 72 S.Ct. 240.

However, "the general presumption that some guilty purpose is required is not applicable to what have been termed public welfare offenses, which typically impose penalties to serve as an effective means of regulation." *United States v. Unser,* 165 F.3d 755 (10th Cir.1999) (citing *Morissette* ). The Tenth Circuit recently addressed this issue in the context of unlawful possession and operation of a motor vehicle within a National Forest Wilderness Area in violation of 16 U.S.C. § 551 and 36 C.F.R. § 261.16(a). *See id.* The Court held that the violation was a public welfare offense and, thus, required no *mens rea* for conviction. In reaching this conclusion, the Court adopted a multi-part test, looking to whether the "federal criminal statute omits mention of intent[,] where it seems to involve what is basically a matter of policy, where the standard imposed is, under the circumstances, reasonable and adherence thereto properly expected of a person, where the penalty is relatively small, where the conviction does not gravely besmirch [the reputation], where the statutory crime is not one taken

over from the common law, and where congressional purpose is supporting...." *Id.* at 762 (citing *Holdridge v. United States,* 282 F.2d 302, 310 (8th Cir.1960) (Blackmun, J.)). "Additionally, the Supreme Court has indicated that most public welfare offenses involve situations where a reasonable person should know that the conduct is subject to stringent regulation and may seriously threaten a community's health or safety." *Id.* (citing *Liparota v. United States,* 471 U.S. 419, 433, 105 S.Ct. 2084, 85 L.Ed.2d 434 (1985)). The Court in *Unser* concluded that these criteria were sufficiently met, despite the government's admission that use of motorized vehicles in a wilderness area does not qualify as conduct "that may seriously threaten a community's health or safety." *Id.* at 763.

*Unser* controls here. *See generally United States v. Brown,* 200 F.3d 710, 715 & n. 6 (10th Cir.1999) (declining to reach the *mens rea* issue because evidence showed that defendant knew he was providing commercial work activity on Forest Service land without a special use authorization, yet citing *United States v. Unser,* 165 F.3d 755, 761–64 (10th Cir.1999)); *United States v. Shenise,* 43 F.Supp.2d 1190 (D.Colo.1999) (willful grazing trespass on federal public lands was public welfare offense, following *Unser* ). The underlying Congressional authorization is the same, and the regulations are similar. The standard imposed was reasonable and Mr. Ellison was put on notice by the terms of his permit. The penalty here is undeniably small. There is no indication that violation of a special use permit would "gravely besmirch the reputation" of Mr. Ellison. The crime "is not one taken over from the common law." Mr. Ellison should have known from the permit process that "the conduct is subject to stringent regulation." As in *Unser,* there is no indication that fishing in Trout Creek "seriously threaten[ed] a community's health or safety," yet this deficiency does not change the outcome. *See id.* at 763.

Mr. Ellison argues that his conviction besmirched his reputation because his permit was not renewed, resulting in a loss of livelihood. I am unpersuaded. *Unser* suggested that a felony conviction would besmirch the reputation. *See id.* at 763. Losing a forest service permit is not on par with a felony conviction and its attendant deprivations. Although Mr. Ellison's reputation may have been "besmirched" to a degree, I cannot conclude it was "gravely besmirched." Even if I were to conclude otherwise, this is but one factor in an equation where all others heavily outweigh it. I therefore conclude that a violation of a special use permit is a public welfare offense, and the Magistrate Judge did not err in convicting despite a lack of *mens rea.*

■ Mr. Ellison next argues that the Magistrate Judge erred in holding him liable for the acts of his employees. I disagree.

"*Respondeat superior* is a familiar concept in the context of 'public welfare' crimes. These offenses are not crimes in the traditional sense; instead, they are a means of regulating activities that pose a special risk to the public health or safety." *Lady J. Lingerie, Inc. v. City of Jacksonville,* 176 F.3d 1358, 1367 (11th Cir.1999). The United States Supreme Court has upheld the conviction of managerial officers for public welfare crimes committed by their employees. *See United States v. Park,* 421 U.S. 658, 673–76, 95 S.Ct. 1903, 44 L.Ed.2d 489 (1975) (president of a national retail food corporation convicted of causing adulteration of food by rodent-infested warehouses because he was in 'responsible relation' to the unlawful failure to maintain sanitary warehouses); *United States v. Dotterweich,* 320 U.S. 277, 281, 64 S.Ct. 134, 88 L.Ed. 48 (1943) (president and general manager convicted for shipping misbranded and adulterated drugs despite lack of knowledge because "the interest of the larger good it puts the burden of acting at hazard upon a person otherwise innocent but standing in respon-

sible relation to a public danger"). *See also Lady J. Lingerie, Inc. v. City of Jacksonville,* 176 F.3d 1358, 1367 (11th Cir. 1999) (conviction based on *respondeat superior* complies with due process where the defendant is in a "responsible relation" to the unlawful conduct or omission, the act is done within "[a] servant, agent or employee's scope of authority," and the penalty does not involve imprisonment); *Joudeh v. United States,* 783 F.2d 176 (10th Cir.1986) (actions of food store managers, who illegally purchased food stamps from third parties away from premises of store and placed them without knowledge of store owner in store cash registers in exchange for cash, constituted conduct of store itself, where store owner exercised minimum supervision and oversight of store operations, and actions of managers occurred often over substantial period of time); *Wolf v. United States,* 662 F.2d 676 (10th Cir.1981) (notwithstanding grocery store owner's personal noninvolvement, disqualification section of Food Stamp Act requires only a finding that store has violated any of the provisions of Act and improper sale by cashier was sufficient to establish a violation).

Here, the applicable requirements are met. The Magistrate Judge correctly found and concluded that this is a public welfare offense and the acts of Mr. Ellison's employees violated the statute. Mr. McLarty was providing guiding services, and turned payment over to the company. Mr. McLarty was therefore acting within the scope of his duties and with an intent to benefit the company when he took customers to Trout Creek. Mr. Ellison further ratified Mr. McLarty's actions by cashing the check and depositing the proceeds into the company account. The Magistrate Judge also found that Mr. Ellison's testimony that he was unaware of the purpose of the check not credible. The punishment here was a small fine, and Mr. Ellison was in responsible relation to the acts.

Mr. Ellison argues that there was no evidence that either his father or sister were employees and, thus, he cannot be held responsible for their actions. While this may be accurate, it does not change the final analysis. It was the trip to Trout Creek that resulted in criminal liability, not the booking of the trip. The trip was guided by Mr. McLarty, and there is no question that he was an employee of Mr. Ellison's at the time. In any event, the undisputed evidence leads to the inescapable conclusion that Mr. Ellison's father and sister acted as his agents.

Mr. Ellison next argues that the government failed to rebut his evidence that he was powerless to prevent the violation and, thus, failed to meet its burden (citing *United States v. Park*, 421 U.S. 658, 673–76, 95 S.Ct. 1903, 44 L.Ed.2d 489 (1975)) (the Act "requires the highest standard of foresight and vigilance," but "does not require that which is objectively impossible"). In *Park*, the Court ruled that, "If such a claim is made, the defendant has the burden of coming forward with evidence, but this does not alter the Government's ultimate burden of proving beyond a reasonable doubt the defendant's guilt, including his power, in light of the duty imposed by the Act, to prevent or correct the prohibited condition." *Id.* at 673, 95 S.Ct. 1903. Here, the Magistrate Judge found that Mr. Ellison's claim of lack of knowledge regarding the source of the check was not credible, and that his acts ratified those of his employees. Additionally, there are a variety of inconsistencies in the record regarding Mr. Ellison's knowledge of the trip and the check, as well as remedial actions he purportedly took upon being informed of the trip. *See* Transcript p. 11–16, 97–129. I therefore conclude that the Magistrate Judge did not err in finding that the government proved Mr. Ellison's guilt beyond a reasonable doubt.

Accordingly, IT IS ORDERED that:

(1) The judgment of conviction is AFFIRMED.