UNITED STATES of America,
Plaintiff,

v.

Joseph G. SHENISE, Defendant.

No. 98–7185–M.

United States District Court,
D. Colorado.

March 18, 1999.

Litigant's Attorney, David C. Conley, Gorsuch, Kirgis, LLP, United States District Court, Denver, CO, for Litigant Joseph G. Shenise, defendant.

## MEMORANDUM OPINION AND ORDER

COAN, United States Magistrate Judge.

Defendant Joseph G. Shenise was charged with willful grazing trespass on lands under the control of the Bureau of Land Management ("BLM") on two occasions, June 27, 1998 and July 3–4, 1998, in violation of the Taylor Grazing Act, 43 U.S.C. § 315a, and BLM regulations, specifically, 43 C.F.R. § 9264.1(a). *See* September 21, 1998 Information. Shenise was advised of the charges contained in the Information and possible penalties and waived a formal reading of the Information and further advisement of Constitutional rights on October 14, 1998.

A trial to the court was held on October 14, 1998, October 21, 1998 and December 23, 1998. Assistant United States Attorney Sheilah M. Rogers represented the Bureau of Land Management and Mr.

Shenise was represented by David C. Conley. Testimony was taken from Keith Berger, Deputy Sheriff Chess, Ranger Jack Hagan, Tony Mule, Merle Blankenship, Robert Clift, Antoinette Shenise, and Joseph Shenise. Counsel stipulated to the admissibility of Exhibits 1 through 37. In addition, government exhibits 38 through 40 were admitted, as was defendant's exhibit A. At the conclusion of the trial, the matter was taken under advisement. The court granted the parties' motion for post trial briefs, which were received February 1, 1999. After careful review of the pleadings, the transcript, and the parties' arguments at trial and as contained in their trial and post trial briefs, the court finds as follows.

I.

The Brush Hollow allotment consists of 240 acres of federal public land under the control of the Bureau of Land Management ("BLM"), located in Fremont County, Colorado, just north of County Line Road 123, which is the W1/2, SW1/4, the W1/2, SE1/4, and the S1/2, NW1/4 of Section 24, Township 18 South, Range 69 West of the 6th Principal Meridian, Fremont County. (Exs.14, 29, 35) Just to the west of the allotment is private land, also known as "the base property," owned by Joe Barela. Because he was a private landowner on land adjacent to BLM land, Barela qualified for and held a permit to graze livestock on the Brush Hollow allotment. Bisecting the Brush Hollow allotment and on its northeast and southwest sides are parcels owned by the state of Colorado. Immediately south of Barela's land is another parcel owned by the state of Colorado. (Exs.33a, 34) Shenise has leased all of the Colorado state lands and his horses are permitted to graze on those lands. (Tr. 24 [1]).

---

**1.** References to the transcript of the trial are as follows. Volume I of the Transcript is referred to as "Tr."; Volume two is "Tr. II;" and Volume three is "Tr. III".

**2.** Under 43 C.F.R. § 4130.6–1, this type of permit may be issued at no cost to applicants

There is a fence along the boundary of Barela's land, except that it deviates west of his property line on the eastern side. (Ex. 34) Although there is some fencing along a portion of the northernmost state parcel of land, there is no fence between the state lands leased by Shenise and the Brush Hollow allotment. (*Id.*) To fence off at least a portion of the state public lands from the BLM would cost between $8,000 and $10,000. (Tr. 46) There have been some discussions between Shenise and the BLM or the state of Colorado about fencing parts of the leased state public land, including fencing off the entire northeast state parcel, but no agreement was ever reached. (Tr. 62–63; Tr. II, 95–99; Tr. III 73–78) The BLM did not consider paying for a fence (Tr. 56–57, 72, 93–94), and, although the BLM discussed fence proposals with Shenise, it did not agree to provide labor or materials to build the fence. (*See,* e.g., Tr. III, 150; Ex. 16) At minimum, various fence proposals would result in Shenise losing at least 40 acres of the northernmost part of his state leased land. (Tr. II, 104) In May of 1998, Shenise indicated he was going to build a fence (Tr. II, 105), but medical expenses prevented him from doing so. (Tr. III, 113) Shenise is still not clear about the boundary lines on the BLM land and state land, but has not taken any steps to determine the boundaries. (Tr. III, 119)

In early 1994, Barela was not turning out cattle and not using his permit on the Brush Hollow allotment, so he applied for non-use of his permit, which was approved by the BLM. In accordance with the terms of the non-use permit, Barela would not pay a grazing fee and would not graze livestock on the BLM land. (Tr. 30)

At various times, the BLM explored the possibility of an "exchange of use" permit,[2] who own or control unfenced lands that are intermingled with public lands in the same allotment when use under such an agreement will be in harmony with the management objectives of the allotment and compatible with the existing livestock operations.

with Barela or his permittee and Shenise, which would allow Shenise to graze his horses on the BLM land without being cited for trespass. (Tr. 33, 66–70; Exs. 12a, 14, 15, Tr. II, 91, 93; Tr. III, 132) If Shenise had agreed to an exchange of use permit, he could have turned out the number of livestock that the state land would support, and there would have been access for his horses also on Barela's property. (Tr. III 132–33) This permit would have allowed both Shenise and Barela to graze their livestock on both the Brush Hollow allotment and state leased lands, so long as the 20 AUM grazing capacity [3] of the BLM land was not exceeded. Shenise did not agree to an exchange of use permit (Tr. 38, 52, Ex. 26), because he perceived it as a financial burden. (Tr. III, 28, 86–87) Shenise previously leased Barela's base land adjoining BLM land which also gave him the BLM grazing permit (Tr. II, 111; Tr. III, 9). At some time in 1996, Shenise had asked Barela if he could lease Barela's BLM permit, but was told that it was a non-use permit. (Tr. III, 107) In discussions with BLM representatives, Shenise was told he could not have the Brush Hollow permit because it legally belonged to Barela, as the owner of the base property. (Tr. III, 138–39) In 1998, Shenise did not have a permit to graze his horses on BLM land.

Shenise and his wife Toni Shenise own the horses pictured in Exhibit 36. The state land which Shenise leases is open territory, with a lot of grazing areas, broken up with pinon and juniper trees. (Tr. II, 114; Tr. III, 13) Shenise turns out ten horses on that land. (Tr. II, 117) The adjoining BLM land is more thickly wooded with pinon, has a lot of shale and is not as good for grazing. On the 80 acre eastern BLM parcel, however, there are some big open meadows and parks, suitable for livestock grazing. (Tr. III, 128; Ex. 33–1)

The parties stipulated that any horses seen in the Brush Hollow area on June 27 and July 3–4, 1998 would have been Shenise's. Toni Shenise testified that, in the summertime, the horses stay in the southern portion of the state land because there is too much activity and traffic near the Brush Hollow reservoir (Tr. II, 118–19; Tr. III, 16, 90) Both Shenises said the horses are more likely to be in the southernmost area due to the noise of fireworks on the Fourth of July. (Tr. II, 119; Tr. III, 18, 91) Shenise said he needs to have his horses graze because it would cost him a fortune to feed them if they were penned up. (Tr. III, 121)

Shenise was warned that his horses could not use the BLM public land for grazing on January 28, 1993 (Ex. 4), January 29, 1993 (Ex. 5), and February 20, 1998. (Ex. 14; Tr. III, 111–13) Shenise knew his horses grazing on the BLM would be trespassing (Tr. III, 112), but he testified he was never told to remove his horses from the BLM property. (Tr. III, 71, 108) On a few occasions before the summer of 1998, either Shenise's horses or the manure they left was found on BLM land. (*See*, e.g., Tr. 102) On two occasions, once in 1997 (Exs.8,9) and again in 1998 (Ex. 12a), Shenise represented that he owned the land where the horses were found on June 27 and July 3–4, 1998.

On June 27, 1998 and just before midnight on July 3, 1998, Ranger Hagan and Deputy Chess observed Shenise's horses grazing in the area west of the Brush Hollow reservoir on BLM land. (Tr. 104, 107–109, 111–113, 138–148, Exs.33(1), 33(2)) Shenise was cited for grazing trespass on June 27, 1998 and July 3–4, 1998. (Exs.17, 18, Information)

## II

Shenise is charged with willful violations of the Taylor Grazing Act, § 315a and 43 C.F.R. § 9264.1(a). The pertinent section of the Taylor Grazing Act states:

---

**3.** An "AUM" is an "animal unit month," which is enough forage to feed one cow for one month. (Tr. 25) The land comprising the Brush Hollow allotment would support 20 AUM's while the state land leased by Shenise would support 96 AUM's. *Id.* Toni Shenise testified she figured about 50 acres of land were needed to feed one horse. (Tr. III, 47)

The Secretary of the Interior shall make provision for the protection, administration, regulation, and improvement of such grazing districts as may be created under the authority of Section 315 of this title, and he shall make such rules and regulations and establish such service, enter into such cooperative agreements, and do any and all things necessary to accomplish the purposes of this subchapter and to insure the objects of such grazing districts, namely, to regulate their occupancy and use, to preserve the land and its resources from destruction or unnecessary injury, to provide for the orderly use, improvement, and development of the range; and the Secretary of the Interior is authorized to continue the study of erosion and flood control and to perform such work as may be necessary amply to protect and rehabilitate the areas subject to the provisions of this subchapter, through such funds as may be made available for that purpose, and any willful violation of the provisions of this subchapter or of such rules and regulations thereunder after actual notice thereof shall be punishable by a fine of not more than $500.

43 U.S.C. § 315(a) (1998).

The pertinent regulation states:

Persons performing the following prohibited acts on public and other lands under Bureau of Land Management Control may be subject to criminal penalties under § 9264.1(k) of this title:

(a) Allowing livestock or other privately owned or controlled animals to graze on or be driven across those lands without a permit or lease or in violation of the terms and conditions of a permit of lease, either by exceeding the number of livestock authorized, or by allowing livestock to be on these lands in an area or at a time different from that designated …

43 C.F.R. § 9264.1(a) (1998).

The penalty, as charged here, sets forth a maximum $500 fine per count for willful violations. 43 C.F.R. § 9264.1(k).

### a. The Taylor Grazing Act and Subsequent Legislation

Before enactment of the Taylor Grazing Act of 1934, 43 U.S.C.A. § 315 et seq., there was "an implied license, growing out of the custom of nearly a hundred years, that the public lands of the United States … shall be free to the people who seek to use them, where they are left open and uninclosed, and no act of government forbids this use." *Buford v. Houtz,* 133 U.S. 320, 326, 10 S.Ct. 305, 33 L.Ed. 618 (1890). In *Omaechevarria v. Idaho,* 246 U.S. 343, 38 S.Ct. 323, 62 L.Ed. 763 (1918), however, the Court said that "Congress has not conferred upon citizens the right to graze stock upon the public lands. The government has merely suffered the lands to be so used." *Omaechevarria,* 246 U.S. at 352, 38 S.Ct. 323. With the Taylor Grazing Act, Congress revoked this "implied license" in favor of an express statutory permit; and in *Osborne v. United States,* 145 F.2d 892 (9th Cir.1944), the court said: "It is safe to say that it has always been the intention and policy of the government to regard the use of its public lands for stock grazing, either under the original tacit consent or … under regulation through the permit system, as a privilege which is withdrawable at any time for any use by the sovereign without the payment of compensation." *Osborne,* 145 F.2d at 896.

The Taylor Grazing Act ("TGA" or "the Act") established a three part legislative goal: to regulate the occupancy and use of the federal lands, to preserve the land and its resources from injury due to overgrazing, and "to provide for the orderly use, improvement, and development of the range." 43 U.S.C. § 315a. One of the key issues the Act was intended to address was the need to stabilize the livestock industry by preserving ranchers' access to the federal lands in a manner that would guard the land against destruction. *See* Taylor Grazing Act, ch. 865, 48 Stat. 1269 (June 28, 1934). In order to accomplish these purposes, Congress provided for the

issuance of grazing permits under the supervision of the Secretary of the Interior, authorizing the Secretary to identify lands "chiefly valuable for grazing and raising forage crops," 43 U.S.C. § 315, to place these lands in "grazing districts," *id.*, and to issue permits within the districts or grant leases outside the districts to "settlers, residents, and other stock owners" to graze livestock. *Id.*, §§ 315, 315b, 315m. The grant of grazing permits is a use of the public domain for the benefit of the United States which receives a fee from the holders of preferential permits and from those holding grazing permits. Taylor Grazing Act, 43 U.S.C. § 315, et seq.

In addition, Congress granted the Secretary broad discretionary authority to "make such rules and regulations and establish such service, enter into such cooperative agreements, and do any and all things necessary to accomplish the purposes" of the Act. *Id.*, § 315a. Regulations issued by the Secretary to carry out the purposes of the Taylor Grazing Act are known as "The Federal Range Code for Grazing Districts" ("Range Code"). Under the Range Code, owners of base property or their lessees are eligible for regular licenses and permits, while exchange of use licenses are issued to applicants "having ownership or control of non-Federal land interspersed and normally grazed in conjunction with the surrounding Federal range." All grazing licenses and permits are granted by the district range managers, employees of the Bureau of Land Management, with the advice of a statutory board of advisors elected from among the stockmen using the grazing district. *See, United States v. Morrell,* 331 F.2d 498, 499 (10th Cir.1964); 43 C.F.R. § 161.6(b) and (c).

■ The Federal Lands Policy and Management Act of 1976, 43 U.S.C. §§ 1701, et seq. ("FLPMA") and the Public Rangelands Improvement Act of 1978, 43 U.S.C. §§ 1901 et seq. enabled the Secretary of the Interior to promulgate new regulations concerning federal rangeland. FLPMA is reviewed in conjunction with the Taylor Grazing Act, as it embodies Congressional recognition that previous legislation did not provide adequately for the protection and enhancement of federal public lands. FLPMA states in pertinent part:

> the public lands [must] be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archaeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; that will provide for outdoor recreation and human occupancy and use . . .

FLPMA, 43 U.S.C. § 1701(a)(8).

FLPMA thus requires that public lands be managed by the Secretary of the Interior, through the Bureau of Land Management, for many purposes in addition to grazing and for all members of the public in addition to those engaged in the livestock industry.

### b. BLM Rangelands and Colorado's Fence-out Laws

■ At issue here is whether Colorado's "Open Range Law" applies as a defense to charges of willful trespass on lands controlled by the United States government through the BLM. The statute states, in pertinent part, "[a]ny person maintaining in good repair a lawful fence . . . may recover damages for trespass and injury to grass, garden or vegetable products, or other crops of such person from the owner of any livestock which break through such fence . . ." § 35–46–102, COLO.REV. STAT. (1998) By the terms of the Open Range Law, a person whose property has been damaged cannot recover for a trespass by livestock unless, at the time of the trespass, the complaining party has maintained a lawful fence in good repair to protect his property. The owner of the livestock is under no statutory duty to fence in his livestock. *See, Williamson v.*

*Fleming,* 65 Colo. 528, 178 P. 11 (1919). If no lawful fence exists, the owner of the livestock is not responsible for nonwillful trespass causing damage to vegetation. *Bolten v. Gates,* 105 Colo. 571, 100 P.2d 145 (1940). *Sabell's Inc. v. Flens,* 42 Colo. App. 421, 599 P.2d 950, 951 (1979), *aff'd,* 627 P.2d 750 (Colo.1981) (en banc).

This is a case of first impression in that counsel did not provide and the court was unable to find any federal district or federal circuit cases analyzing the impact, if any, of state fencing statutes on federal lands managed by the BLM. The government maintains that Colorado's fencing laws are inapplicable to federal lands because the Colorado law conflicts with the Taylor Grazing Act and its implementing regulations, relying upon a number of cases concerning grazing on Forest Service land maintained by the Secretary of the Department of Agriculture. Shenise asserts that there is no authority holding that the Taylor Grazing Act preempts all state fencing statutes.

In *Bilderback v. United States,* 558 F.Supp. 903 (D.Or.1982), the court held, in a Federal Tort Claims Act action against the government, that state grazing laws had no application to federal lands. In *Zinn v. BLM,* Interior Dec., CO 030–87–1 (Sept, 9,1988), Zinn's grazing permit was canceled due to his livestock's grazing trespass. During negotiations to settle the trespass violation, Zinn took the position that the Colorado fencing statute applied and that it was the obligation of the BLM to fence out Zinn's cattle. The administrative law judge rejected that argument noting that "[a] different rule would place the public domain of the United States completely at the mercy of state legislation." *Zinn,* p. 9 (internal citation omitted). The administrative law judge also rejected Zinn's argument that the BLM was estopped from claiming trespass because it had discussions with Zinn which led Zinn to believe that the BLM would assist him in constructing a fence. And, in *Light v. United States,* 220 U.S. 523, 534–537, 31 S.Ct. 485, 55 L.Ed. 570 (1911), the Supreme Court granted injunctive relief to the Secretary of Agriculture under the Forest Reserve Act against a cattle rancher who claimed that Colorado's statute requiring a land owner to construct and maintain a fence applied to forest land, and held that a livestock owner who has not obtained the requisite permit is not entitled to turn his livestock out on government land even though the government has not complied with local fence laws.

The court finds that, under the Supremacy Clause of the United States Constitution, federal law overrides conflicting state law with respect to federal public lands. *Kleppe v. New Mexico,* 426 U.S. 529, 543, 96 S.Ct. 2285, 49 L.Ed.2d 34 (1976). The court further finds the reasoning of *Bilderback and Zinn* persuasive. Management of the federal public land should not be at the mercy of state legislatures. Federal law as expressed in the Taylor Grazing Act prohibits grazing trespass on federal land without a permit. There is no obligation under the Act for the BLM to fence out potential trespassers.

Shenise argues that Section 315c expressly requires the BLM to comply with Colorado's Open Range Law. He contends that the cases cited by the United States involving Forest Service land and the Department of Agriculture are distinguishable because the Taylor Grazing Act "specifically refers to and incorporates the fencing statute of the state on which the BLM lands are located," citing 43 U.S.C. § 315(c). (Def. Trial Brief, p. 3) Section 315c of the TGA provides:

Fences, wells, reservoirs, and other improvements necessary to the care and management of the permitted livestock may be constructed on the public lands within such grazing districts under permit issued by the authority of the Secretary, or under such cooperative arrangements as the Secretary may approve. *Permittees shall be required by the Secretary of the Interior to comply with the provisions of the law of the State within which the grazing district is located*

*with respect to the cost and maintenance of partition fences.*

43 U.S.C. § 315c. (Emphasis added).

Under the plain language of § 315c, however, the Secretary is not directed to follow state fencing laws. Instead, the section grants discretionary authority to the Secretary to decide whether to allow necessary range improvements (e.g., he "may" allow construction); he may issue permits or he may authorize construction under "such cooperative agreement" as he "may approve." Another regulation provides in relevant part:

> The Bureau of Land Management may enter into a cooperative range improvement agreement with a person, organization, or other government entity for the installation, use, maintenance, and/or modification of permanent range improvements or rangeland developments to achieve management or resource condition objectives. The cooperative range improvement agreement shall specify how the costs or labor, or both, shall be divided between the United States and cooperator(s).

43 C.F.R. § 4120.3–2(a) (1995).

The court does not accept defendant's argument that the language of the Taylor Grazing Act, in § 315c as set forth above, allows for application of Colorado's open range law. Rather, the Act expressly addresses state law only with respect to the cost and maintenance of the fence which the Secretary, in his discretion, may allow the permittee to construct. If the BLM then chooses to enter into a cooperative range improvement agreement with the permittee under 43 C.F.R. § 4120.3–2(a), then there may be a further agreement concerning who pays what share of the cost of constructing the fence.

Defendant contends, that because the Colorado fence law applies to the BLM in accordance with the language of Section 315(c) of the Taylor Grazing Act, the BLM is also governed by Colorado's Partition Statute which reads "Where the agricultural or grazing lands of two or more persons adjoin ... it is the duty of the owner of each tract to build one half of the line fence, such fence to be a lawful fence as described in Section 35–46–101." § 35–46–112, COLO.REV.STAT. (1998). Shenise argues that he has repeatedly asked the BLM for assistance in building a fence. Because the court finds that the Taylor Grazing Act does not require the BLM to comply with state law concerning the obligation to fence out trespassers, then Colorado's Partition Statute as it pertains to the responsibility of adjoining landowners with respect to fencing also does not apply unless the BLM has agreed to the contrary under 43 C.F.R. § 4120.3–2(a).

**c. Whether the Colorado Fencing Statutes are a Valid Exercise of the State's Police Power not Subject to the Taylor Grazing Act**

Shenise argues that the Taylor Grazing Act authorizes application of Colorado's fencing statutes because the fencing statutes are a legislative expression of state public health and welfare policy, not preempted by the Taylor Grazing Act. Shenise refers to 43 U.S.C. § 315n of the Taylor Grazing Act as follows:

> Nothing in this Act shall be construed as restricting the respective States from enforcing any and all statutes enacted for police regulation, nor shall the police power of the respective States be, by this Act, impaired or restricted, and all laws heretofore enacted by the respective States or any thereof, or that may hereafter be enacted as regards public health or public welfare, shall at all times be in full force and effect: Provided, however, that nothing in this section shall be construed as limiting or restricting the power and authority of the United States.

43 U.S.C. § 315n.

Shenise contends that the 1870's Colorado Fencing Statutes are an embodiment of a legislative decision to promote the public health and welfare by requiring that owners of property fence out livestock. Shenise relies upon *Hatahley v. United States* 351 U.S. 173, 76 S.Ct. 745, 100 L.Ed. 1065 (1956) for the proposition that Section 16

of the Taylor Grazing Act does reserve certain police powers to the States and that the Federal Range Code did not preempt a Utah statute addressing abandoned horses.[4] In relying upon *Hatahley* and other cases, Shenise appears to argue that his horses roaming over public land are a nuisance; that the police power of the state is enacted to deal with such nuisances; and that, therefore, the Colorado fencing statutes apply so that the BLM should fence out Shenise's horses.[5]

■ It is not disputed that the police power of the state extends over the federal public domain within the state unless Congress has determined to deal exclusively with the subject. *Omaechevarria,* 246 U.S. 343, 38 S.Ct. 323, 62 L.Ed. 763. The police power may be employed to protect against a public nuisance. What constitutes a public nuisance is a question of law. A public nuisance has been defined as "the doing of or the failure to do something that injuriously affects the safety, health, or morals of the public, or works some substantial annoyance, inconvenience, or injury to the public, and is a nuisance which causes hurt, inconvenience, or damage to the public generally, or such part of the public as necessarily comes in contact with it." *Bowden v. Davis,* 205 Or. 421, 289 P.2d 1100, 1110–11 (1955) (internal citations omitted).

■ Law enforcement authorities have not contended that Shenise's horses are a public nuisance requiring Colorado police oversight. The police power of the state of Colorado does not apply to the facts here, which are simply, that Shenise has allowed his horses to graze on federal land. Even if the police power of the state did apply, the *fencing laws* have nothing to do with abatement of a public nuisance. If Shenise's horses were creating a public nuisance, under *Hatahley,* the BLM would only be required to give him notice before rounding up the horses and disposing of them in accordance with Colorado law for the abatement of a public nuisance.

### d. BLM's Refusal to Grant Shenise a Brush Hollow Permit

■ Shenise argues that he should not be held responsible for grazing trespass on

---

**4.** Shenise's reliance is misplaced, as the case is distinguishable on both the facts and the law cited. *Hatahley* was a Federal Tort Claims Act action by Native Americans for damages incurred when federal range agents appropriated and sold or destroyed the Native Americans' horses. The court held that under the Taylor Grazing Act, the range agents were required to give notice to the Native Americans of the claimed violations of federal grazing law when such notice was a condition precedent under Federal law to the proper invocation of the local impoundment statute. The Court held that the Utah statute did not apply because the Federal Range Code required notice prior to impoundment of the horses under the Utah statute, citing Section 161.11(b) of the Federal Range Code. *Hatahley,* 351 U.S. at 179–80, 76 S.Ct. 745.

**5.** Shenise further relies upon the Arizona case of *Ricca v. Bojorquez,* 13 Ariz.App. 10, 473 P.2d 812 (1970), which held that a person's grazing rights under the TGA were subjected to state legislation creating a no fence district. In *Ricca,* the plaintiff was the holder of a grazing permit on federal land. He protested as unconstitutional the formation of a "no-fence district" as authorized by Arizona statute because he was not given notice prior to the enactment of the statute. The "no-fence district" legislation in effect reinstated the prior common law which held that an owner of livestock was liable for damage caused when his animals trespassed onto the land of another and the landowner had no duty to fence his lands to keep trespassing livestock out. *Ricca* complained that he was required to curtail the grazing activity of his cattle in and near the no fence district in order to avoid liability for trespass. A panel of the Arizona Court of Appeals rejected Ricca's argument, reasoning that the no fence district legislation was similar to town ordinances prohibiting the at large roaming of animals, and therefore an exercise of state police power permitted by Section 315n of the Taylor Grazing Act. The court finds this state law case inapplicable to the circumstances here. In *Ricca,* the result of legislatively creating the no fence district was to create liability for the BLM permittee when his cattle trespassed onto defendant's state land. Creation of the no fence district in effect made both federal and state lessees liable for trespass, thereby creating a uniformity and not a conflict between federal and state law.

BLM land because the BLM has refused to lease the Brush Hollow allotment to him. Shenise further maintains he has a statutory preference to lease the Brush Hollow allotment under 43 U.S.C. § 315m, which grants a preference to the owner or lawful occupant of land contiguous to BLM grazing allotments. There was evidence that, in 1988, Shenise paid $1800 per year to lease base property owner Barela's land and his grazing rights on the adjoining Brush Hollow BLM allotment. Shenise contends that, in recent years, the permittee, Jose Barela, has violated BLM regulations through his repeated non-use of the allotment, and that as a result Shenise should be granted the permit. Shenise has asked the BLM if he could pick up the Brush Hollow allotment grazing permit, and was told he could not because Barela still had the permit. (Tr. III, 84) There was substantial evidence that the BLM was not inclined to grant Shenise the permit as it belonged to Barela and was attached to his base property. The only other option for Shenise was for him to lease the base property of 640 acres which would then give him rights to the BLM permit as well. Shenise did not want to do that.

Shenise's argument is without merit because it was clear from the evidence presented that the BLM was authorized by regulation to allow Barela's non-use permit. See, 43 C.F.R. § 4170.1–2. The BLM was under no obligation to deviate from its authority to allow non-use. The BLM had no statutory authority to grant Shenise the Brush Hollow allotment grazing permit separate from the base property. Instead, and as was within the Secretary's statutory authority, Shenise was offered the exchange of use alternative which he also rejected.

### e. Trespass violations

The burden is on the government, by proof beyond a reasonable doubt, to show that Shenise willfully permitted his horses to graze or be driven across BLM lands without a permit or lease. It is undisputed that Shenise did not have a permit to graze his horses on BLM land.

A grazing trespass exists when livestock are grazing on federal public lands in excess of authorized permit use or without an appropriate permit or license. *Holland Livestock Ranch v. United States,* 655 F.2d 1002, 1005 (9th Cir.1981) (internal citations omitted) (Ranch owner sued government in civil action protesting restriction on grazing permit following administrative determination of grazing and access trespass). In a civil action, "access trespass" may be presumed when cattle are found upon unfenced private land which is contiguous to restricted public land, because it rationally may be inferred that livestock with unrestricted access to contiguous public lands will use that access. *Id.* at 1005–06. The presumption is "based on the principle that 'as the boundaries between the federal range and private lands [are] of a legal rather than a physical nature it strains credulity to believe that the animals grazing would respect the same.'" *Id.* at 1005. "Where federal and private holdings are commingled in an unfenced area of limited carrying capacity, stock will foreseeably and inevitably graze without regard to boundary lines." *United States v. Morrell,* 331 F.2d 498, 500 (10th Cir.1964), *cert. denied,* 379 U.S. 879, 85 S.Ct. 146, 13 L.Ed.2d 86 (1964).

Toni Shenise testified that their horses preferred the "safe haven" of the southernmost state property away from Brush Hollow, but she also said with reference to cattle preferring to graze on the state land that "[w]ithout anybody out there to monitor them, they will not stay." (Tr. III, 29) Shenise testified that the horses graze on BLM land sometimes when he rides them across BLM land. (Tr. III, 96, 121) Shenise contends that he did not intentionally allow his horses to graze on public land, but he admitted that constructing a fence would "stop my horses from going on the BLM" (Tr. III, 81), and that a fence was necessary because he knew his horses went on BLM land because "there's noth-

ing to keep them from going there." (*Id,* 96–97) It is undisputed that neither Shenise nor his wife made any effort to keep their horses off BLM land.

The parties stipulated that any horses seen in or around the Brush Hollow allotment were Shenise's. On June 27, 1998 and just before midnight on July 3, 1998, state deputy sheriff Chess and Ranger Hagan observed ten of Shenise's horses grazing in the area west of the Brush Hollow reservoir more than 400 feet east from the state land boundary line on BLM land. (Tr. 104, 107–112, 116, 138–146, 176–79; Exs. 17, 18, 31, 32, 33, 33(1), 33(2), 34, 39) Shenise contended that there were more roads in the area than had been testified to by government witnesses (Tr. III, 61; Ex. A); but other than that testimony, there was not evidence to contradict the location of the horses as testified to by Hagan and Chess.

Surveyor Mule, based on information he received from Ranger Hagan, confirmed that the area in which Ranger Hagan had seen the horses on June 27 and July 3–4, 1998 was on BLM land. (Tr. II 33–34, 36–38, 52; Exs. 28, 39) The location of the horse sightings was confirmed by cadastral survey, referencing certain fixed points or sites. (Exs.28, 31, 32) Mule plotted the location of the sightings on June 27 and July 3–4 on Exhibits 33(1) and (2). These exhibits both show the horses' location to have been well within the boundaries of the Brush Hollow allotment, a little over 400 feet east of a parcel of state land and about 1200 feet northeast of the brass cap showing the boundary line between a parcel of state land and the easternmost parcel of the BLM land. (Exs.33(1), 33(2)) This is not more than 100 feet west of the area in which Shenise had previously complained that BLM quad-dusters were setting up camp on "his" property. (Ex. 33a, "Q.D." markings).

The court thus finds that there was actual grazing trespass as testified to by Ranger Hagan and Deputy Chess on June 27, 1998 and July 3–4, 1998.

**f. Willfulness**

The government has to prove that Shenise willfully permitted his horses to graze on BLM land.

The Taylor Grazing Act and the applicable regulation do not define willful behavior. In similar cases involving Forest Service regulations, courts have held that intent is not an essential element of cattle intruding on Forest Service Land. *See, United States v. Larson,* 746 F.2d 455, 456 (8th Cir.1984).

The location of the horses on June 27 and July 3–4, 1998 was noted by government witnesses Chess and Hagan and later verified using a previous survey done in 1997 on the area and a subsequent survey in October 1998. (Tr. 170–174, Tr. 11 14–15, 21–32, 81–82, Exs. 29, 31, 32, 33(1), 33(2), 39) Ranger Hagan was sure the horse sightings were on BLM land because of his familiarity with the area, the lay of the land, the topography, the vegetation, the fence lines in the area (Tr. II 84–85), and the location of the road and a tree near the road. (*Id.* 86, 88). Mule's survey verifying the location was not discredited. Shenise himself said that he knew the area well enough to find a spot he had been to previously within a few minutes. (Tr. III, 61)

Further evidence was that the BLM had seen manure from Shenise's horses on BLM land beginning in 1993 (Tr. 168, Exs 2.1, 26), or had seen Shenise's horses on BLM land. (Tr. 102, 104, 119, Ex. 26). On May 2, 1997, Shenise told BLM quad-dusters and a cleanup crew setting up camp in the Brush Hollow allotment to move because they were on his land. (Tr. II, 60–63; Exs. 8, 9, 33a) When charged with grazing trespass in the Brush Hollow allotment west of the Brush Hollow reservoir, Shenise's partners, Beverly and Terri Nichols advised the ranger that Shenise had told them he owned the entire area including the BLM land; and that their arrangement was that Shenise would get half the profit from the calves in exchange

for allowing them to graze on his land. (Ex. 11)

According to the government, Shenise's turning out ten horses on his leased state lands, rated at 96 AUM's, exceeded the carrying capacity of that land unless Shenise was feeding the horses in addition to letting them graze. (Tr. III, 135–36) Shenise said it would cost him a fortune to feed his horses, so he was financially motivated to allow his horses to graze on the BLM land. Shenise had been repeatedly notified and warned of his duty to prevent grazing trespass from occurring. (Tr. 53, Exs.5, 14, 15, 37) Despite those warnings, Shenise has refused to accept an exchange of use permit and has refused to contain or fence in his horses.

■ Because Shenise represented that he owned the BLM land; because he refused to consider an exchange of use permit; because he refused to fence in his horses; because of previous warnings, and because he become hostile and abusive when confronted, the court finds that the grazing trespasses on both dates charged was willful.

Moreover, in *United States v. Unser*, 165 F.3d 755 (10th Cir.1999), a panel of the Tenth Circuit analyzed a regulation promulgated by the Secretary of Agriculture applicable to National Forest lands which was silent on a *mens rea* element because it was a "public welfare offense." The court found a guilty purpose not required for public welfare offenses, relying upon the test set forth in *Morissette v. United States*, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952) and subsequent cases, which to date have dealt with Secretary of Agriculture regulations applicable to Forest Service lands. The court adopted *Morissette's* reasoning as follows.

These cases do not fit neatly into any of such accepted classifications of common-law offenses, such as those against the state, the person, property, or public morals. Many of these offenses are not in the nature of positive aggressions or invasions, with which the common law so often dealt, but are in the nature of neglect where the law requires care, or inaction where it imposes a duty. Many violations of such regulations result in no direct or immediate injury to person or property but merely create the danger or probability of it which the law seeks to minimize. While such offenses do not threaten the security of the state in the manner of treason, they may be regarded as offenses against its authority, for their occurrence impairs the efficiency of controls deemed essential to the social order as presently constituted. In this respect, whatever the intent of the violator, the injury is the same and the consequences are injurious or not according to fortuity. *Hence, legislation applicable to such offenses, as a matter of policy, does not specify intent as a necessary element. The accused, if he does not will the violation, usually is in a position to prevent it with no more care than society might reasonably expect and no more exertion than at might reasonably exact from one who assumed his responsibilities. Also, penalties commonly are relatively small, and conviction does not grave damage to an offender's reputation. Under courts have turned to construing statutes and regulations which make no mention of intent as dispensing with it and holding that the guilty act alone makes out the crime.*

*United States v. Unser*, 165 F.3d 755, 1999 WL 1601, citing *Morissette*, 342 U.S. at 255–56, 72 S.Ct. 240 (emphasis added); *see also, Unser*, 165 F.3d 755, 762.

■ Following the reasoning of the *Unser* Court, the court finds that the concept of a public welfare offense is easily extended to BLM lands, that grazing trespass on BLM land is a "public welfare offense;" and, that the mental element of intent may be proven by proof of the guilty act itself. The offense charged here of grazing trespass on BLM land does not include an express *mens rea* element; the duty imposed, that of keeping livestock off public lands is reasonable; the statutory

scheme is not derived from the common law and the congressional purpose is supportive, that of protecting public lands from overuse, including overgrazing; and conviction, as it involves only a misdemeanor, does not gravely besmirch Shenise's reputation, and the penalty is relatively small. The fine sought here was less than that considered in *Unser*. The *Unser* court found that the maximum jail sentence of six months imprisonment sought against Unser was "relatively small" under the *Morissette* test. Because the government here seeks only the penalty for a willful violation of $500 per count, the court finds that the penalty is "relatively small." All elements of the offense as charged here meet the *Morissette* test for a public welfare offense. The court thus finds that in committing the public welfare offenses charged, Shenise's conduct was also willful.

### III.

The Court finds that the prosecution has established willful grazing trespass by proof beyond a reasonable doubt when Shenise allowed his horses to graze on the Brush Hollow allotment without a permit in violation of 43 C.F.R. § 9264.1 on June 27, 1998 and July 3–4, 1998. Accordingly, it is hereby

ORDERED that defendant Shenise is found guilty on Counts I and II of the Information for the reasons set forth herein.